Good morning, Your Honors. Kent Maynard, I represent the Appellant, the Iowa Malls. Good morning, Your Honors. Tim Meaton on behalf of the G.K. Appellees. Okay, this morning we have allotted 30 minutes for this case. That time will be divided equally between the two sides. The Appellant can reserve some time for rebuttal. That 30 minutes is a goal. We can be a little bit flexible this morning because this is the only case on the docket, but we will try to keep those time frames in mind. And with that, you may proceed. Thank you, Your Honors. My name is Kent Maynard, and as I said, I represent the Appellant in this case, which is the seller of four shopping malls located in Iowa. The sale closed in December of 2004, and at the time the deal closed on the 17th of December 2004, a tenant of the mall was in the process of moving to a larger and more expensive leasehold in the mall, which would generate substantial incremental revenue for the owner of the mall. The trial judge here had a three-week trial and made certain findings. What is the standard of review on her finding that this was a proper liquidated damage provision? The validity of a liquidated damages provision is a question of law. Questions of law are reviewed in this Court pursuant to a de novo standard, which is not deferential at all. Why don't you address what your opponent's brief says? Well, my opponent's brief... I'm sorry, Your Honor, which findings of fact are you referring to, in the opinion or in... What we're looking for is an articulation of what the appropriate standard of review is here. We understand that the ultimate question of whether or not this is liquidated damages is de novo, because it's a question of law. But how do we look at the necessary antecedent findings of fact that the judge made before coming to the conclusion that it was liquidated damages? Well, to the extent that the judge or the trial court articulates and cites record evidence to support the conclusion that this was a valid award of liquidated damages as distinct from a penalty, then those findings of fact, to the extent that they are tied to record evidence, would be entitled to some deference. However, when you review the opinion, you don't see any reference to any record evidence. What you see is speculation, which, frankly, is speculation about matters which are entirely moot and irrelevant. And by that, I'm referring to the notion that the possibility that the tenant in the mall might not move to the larger space could have signaling effects, and by signaling effects, I mean this notion that it was a marketing tool, that you had a big box that was vacant, that this might drive tenants out of the mall and prevent new tenants from coming in, all of which is completely speculative and completely irrelevant, because the buyer bought that risk. By that, I mean the buyer purchased the mall without any right of rescission, without any representation and warranty about the relocation that we're talking about here actually occurring or not. They owned the risk that the space might not be occupied. And so to speculate about whether damages might be recoverable for a contingency that they already owned is beside the point. I'm not sure if there are other findings of fact that you're concerned about, Justice Lavin. I have to be honest and say that one of our concerns, and I think we expressed it at some length in our pleadings, is that the opinion really doesn't provide any real analysis. I want to say 80% of the analysis is about whether this is a drop-dead deadline. Well, if a drop-dead deadline is a code word for a penalty, it really doesn't matter if they intended that at all, because penalties are unenforceable as a matter of public policy and as a matter of Illinois law. So after spending all this time to figure out what the parties intended, which is irrelevant if it's a penalty, then we have at the tail end a kind of coda, which is a very perfunctory walkthrough of the elements under Jamison, Realtv, and Costiner. And by perfunctory, I mean, for example, the fact that there are three elements, and the Court's analysis of the first prong of the test consists of a single sentence. One sentence. And not only that, the first prong as articulated in the trial court's opinion isn't even correctly stated. It's not even correctly stated. And in fact, if you read the gloss that the trial court put on that first prong, it suggests that what we're really concerned about here is something like fraud in the factum. How did the language get in the contract? That's not the issue under this Court's decision in Jamison. It's irrelevant. What we want to know is, under the first prong, did the parties agree that a specific sum of money would be awarded as damages for a specific breach? She didn't consider the question. If she had, she would have seen that that is manifestly impossible based on the unrebutted, universally acknowledged facts of the case. And what do I mean by that? I mean that the parties both stipulated at trial, and we agreed based on the pleadings that have been submitted to this Court, that the number in question, this $4.3 million number, was calculated by the buyer as the entire value on the margin, incrementally, of a 20-year stream of cash flow from the new lease that we're talking about. 20 years. 240 monthly payments. And the way they calculated that was by saying, the incremental cash flow is $430,000 a year. We divide by an appropriate cap rate, which is risk-adjusted. In this case it was 10%. It was the same cap rate that was applied to all the cash flow on all the four properties that were purchased in this case. And then we say, the value of that incremental cash flow is $4.3 million. Now, that's an estimate or evaluation. It's not an attempt to predict damage. It can't be. An estimate of the value of a financial asset over a 20-year period is not the same thing as predicting what damages may flow from a big box retail space remaining vacant for another month or two. Or three in this case. But in this case, then you're saying there's a total absence of evidence as to any other reference to something less than that absolute thing. So that means they did not negotiate it. Therefore, is Justice Judge Quinn right when she says, this is the only alternative I have? Meaning, there's no reference in the evidence as to a partial breach or anything discussed or anything that appears. In other words, the attorneys that originally drafted this didn't do a good job. If we could go back now in the fullness of time. No, I have no idea who did. But I'm saying, when I drafted things for the City of Des Plaines, we never left. You had five alternatives when there was any potential for the contractor to build a road or do something. Well, you know, if you look at the language here, I mean, here's the supreme irony in this case. This $4.3 million price adjustment. We all know what it, we know what it was intended, but it isn't there. Well, it is if you look at the record evidence. It is if you look at what happened in October of 2004 when Mr. Tom Rogers sent in the communication and he said, you know, we have an issue because we priced, we priced this purchase based on an assumption. The assumption is that Hy-Vee, the supermarket, is moving into the new space and that we're going to get this incremental revenue of $430,000. Well, they signed the lease. Well, no, the lease wasn't signed until June of the following year. Right, but that's still before. Before the lease was signed. Now, remember, we already had two letters of intent from the supermarket by the time, in 2004. But the key point is here, the genesis of this $4.3 million number is Mr. Tom Rogers on behalf of the buyer saying, look, we, buyer, don't want to pay for something that we don't get. Perfectly reasonable. If Hy-Vee doesn't move into the new space, why should they pay the $4.3 million? If that had happened, if that contingency had failed, we wouldn't be here today. The problem is they did move into the space. And since November of 2006, the buyer has been getting, reaping the benefits of the bargain, which they asked for, every month and will continue to do so for another 13 years and potentially for another 25 years after that. And they say that they don't want to pay for it. In other words, this provision, which in its genesis was to protect the buyer from paying for something it didn't get, as applied by the trial court, permitted the buyer to get something that it didn't pay for. It's a complete inversion and a complete perversion of what that provision was supposed to do. It couldn't be more wrong. We're not off by $4.3 million. We're off by 4.3 times 2. Because we didn't get paid. We did what we were supposed to do. And by the way, when you talk about a specific sum for a specific breach, what is the breach that's claimed here? Delaying plans, right? Getting plans? Right. And who had control over that process? Hy-Vee. Hy-Vee and? Third party. The buyer. All the buyer had to do was something that in fact the buyer did. If you look at the deadlines in this case and you parse through them, what you discover is Hy-Vee sends the signed lease that Justice Smith refers to, sends the lease for execution to the buyer on June 16th of 2005. What does the buyer do? Strangely, they sit on it for a month. And they say it's because they had two concerns which they abandoned. We don't know what they were. There's nothing in the record about what they were. But they must have been terribly important because no one even talks about them. And what does that one month delay do? Well, if you parse through these deadlines and you discover all of a sudden that the 120-day window for the two parties, buyer and tenant, not us, goes from if they had signed it right around that original date that it was sent to them, the deadline would have been the 14th of October. Still time to comply with this so-called drop-dead date. But guess what happens when you sit on a contract for a month? Then you're in such a hurry. Remember, we're really in a hurry. 91 days, forfeiture of $4.3 million here. We're in such a hurry that we sit on it for a month and what does that do? That moves the deadline for these two parties to agree to November 13th. Now we can't comply. Strange coincidence. Strange when you think that this buyer had $4.3 million reasons to drag its feet and that's precisely why under Illinois law penalties are not enforceable because they give promisees a perverse incentive to induce breach by the promisor. This was a penalty. It was not a reasonable prediction of loss. We know what it was. It was a number that was generated by Mr. Tom Rogers in October as a price adjustment to protect the buyer from paying for something it didn't get. Could it have been a liquidated damage amount, a proper liquidated damage amount for a different breach in this case? Yes. Okay. Explain that to us. Here is the way they could have done it. In the event that the Hy-Vee relocation does not occur, now this would have been obviously different language, but in the event the Hy-Vee relocation does not occur, then the escrow balance shall be returned to the buyer. Why? Because they didn't get the benefit of the bargain. And there's a relationship between the amount of money and the breach. Absolutely. It's because the number of $4.3 million is the entire value of the asset. It's as though I were contracting to deliver a car with a price of $10,000 to someone, and in this case the notion is that if I deliver it a day late, the buyer doesn't have to pay for it. And it isn't just damage from the one-day delay, it's a complete forfeiture of the entire purchase price. This is the position that we're dealing with here. And the sad thing is that if you step back and look at it, it's absurd on its face, but liquidated damages tend to create confusion, which is what the Supreme Court has told us. And the reason, I think, is in part because the standard itself is somewhat peculiar in that we are instructed in the prongs two and three that it should be a reasonable prediction of damages which are difficult or impossible to prove. There's a contradiction there. It has to be a reasonable prediction of something which is difficult or impossible to prove. Now, when you read the case law, it becomes more clear. And one of the important points about difficult or impossible to prove is that in the case law that says, well, look, if at the time you're contracting, you really don't have a reasonable concern about whether you can prove damages, then you really shouldn't be talking about liquidated damages. And that's true here. We didn't need a liquidated damage provision to protect anyone against the eventuality that Hy-Vee might not, because it was very simple. They don't move in, $4.3 million. You get it back. Whether there's liquidated damages or not, you could have just sued for breach, given weapon warranty for it. Speaking of confusion, could you elaborate for us your position and how the court got confused with this concept of this being a defensible ruling based on the fact that this was an arm's-length negotiation between sort of big players in the real estate business? Well, first of all, the Illinois case law is absolutely clear that you don't, if it's a penalty, it's unenforceable. It doesn't matter how sophisticated the parties are, period. So you don't get to say, well, it's a penalty, but everybody was really smart. They all had MBAs and JDs, which is what really happened here. This judge was so impressed with the fact that my clients are sophisticated and intelligent people that she said, well, let's give them what they agreed to. But that's not the way it works. This court, the courts of the state of Illinois, will not enforce a penalty. It doesn't matter if the contracting parties are both genius IQs. It just doesn't matter. So the court got confused because she started to think, apparently, and she spends most of her time analyzing what it is that the parties intended with respect to this drop-dead deadline. And I submit to you, to the extent it is a drop-dead deadline, it's a penalty, and it really doesn't matter if they agreed to it or not. It just doesn't matter. And she spent so much time worrying about this red herring issue that by the time she got around to doing the work on Jamison, as I say, first prong, one sentence. All she had to do was cut and paste it from Jamison itself. Couldn't get that right. It's a different Quinn who wrote that, though. We've got a lot of Quinns involved here. It's a lot of Quinns. He thinks he's a genius. That Quinn. You're talking about? But we recognized. I have to be candid with this tribunal and say that, you know, we've slaved over our pleadings. I don't know that there's a whole lot more I can add. I'd like to reserve some time. I'd like to reserve five minutes if I haven't already eaten it up. But we really didn't hold anything back here. We think that, for the reasons expressed, that this is really an obvious miscarriage of justice, and it's an obvious instance of what we could call cognitive dissonance, where it's a complex. The doctrine of liquidated damages, because it seems to contemplate this sort of contradictory notion of it has to be a reasonable prediction of something which is somehow fundamentally incapable of precise prediction. I think it confuses a lot of people, a lot of jurists. And that's what the Illinois Supreme Court has said. So there was confusion here. There was no malice. The problem is the result is shocking. And I thought I'd like to reserve my time. Thank you. Mr. Eaton. Good morning, Your Honors. Tim Eaton on behalf of GK. First of all, let me address the standard of review, because that's probably the only issue that I agree with counsel on. First of all, whether there's liquidated damages is an over-review question of law. The findings of fact is a manifest void of evidence. And facts that he overlooked in response to your question, Justice Levin, are several. First of all, the trial judge found Hy-Vee was one of the anchor stores at the mall. Its space could be modified to house two new additional anchor stores, and an expanded Hy-Vee was marketed as a draw for other retailers to the mall. Based upon that finding, she found that there could be more damages than just the incremental value of the rent that Hy-Vee was going to be paid over this additional time. But it could result in other tenants, smaller tenants, not signing leases or not coming to this mall. And as a matter of fact, what she held then as a conclusion based upon that finding was that there were a number of scenarios that could have arisen if Hy-Vee failed to execute the lease, and that's all he's talked about, a total failure. But those are not facts. Pardon me? Her conclusions are not facts. No, but let me get to this. I agree with you, Your Honor. But what she also said was either that they failed to execute the lease or proceeded with steps necessary to occupy the new lease. That's what happened here. They did not proceed within the time frame set forth in the agreement with the approval of the plans to the government agencies. That was three months late. What could have happened during that three months? Well, he calls it total supposition and hypothetical and is very critical of the trial judge for suggesting that there could be damages over and above Hy-Vee failing to sign. Well, if this Court would look at Weiss v. U.S. Fidelity, which is one of the few Illinois Supreme Court cases that has addressed this issue, that case also involved tenants in a construction project. And the Illinois Supreme Court said it is entirely reasonable to suppose they were supposing, as contended by the plaintiff, that the parties contemplated that if they were not to complete the job on time, it would result in a loss of renters and of the rents of the building, not only for the actual time that the building was delayed in completion, but also for some considerable time thereafter. There are many reasons that it might be suggested why it might have been important to the owner to have this building completed on time to ensure him rent and save him from damages. And we think it was within the province of the parties to determine the amount of compensation to be paid for the delay. What we have here is a delay case. There's no question about it. There was not a total failure of Hy-Vee signing the lease. But as counsel said, again, Your Honor, in answer to Justice Lavin's questions, well, how could you have drafted it differently? First of all, let me say, and I'll say it again and again, this was a negotiated lease. That is a finding of fact. In fact, that was a stipulation by the parties. And what they negotiated was not if there's a total failure for Hy-Vee to What they negotiated was a deadline that if Hy-Vee doesn't have everything together by October 31, 2005, the hold back goes to the buyer. But that's not clearly stated anywhere in the agreement. Oh, absolutely, Your Honor. In the Third Amendment to the Real Estate Act. That's after the fact, though, really. No, no, no, Your Honor. With all due respect, they had signed an agreement in December of 2005 prior to the closing. And in that agreement, in 1K, in the record, in that agreement it says that if three things are not done by those deadlines, the hold back is returned. And one of them is by October 31st, they were ready to hand over the premises to Hy-Vee. That sounds like it's a means to punish non-performance. And the problem I have with your position here and the problem that I have with the judge's decision below is that I just don't know how the judge's decision below complied with this specific language from Jamison, which I think is what this case is all about. The court says, additionally, the damages contained in the liquidated damages clause must be for a specific amount for a specific breach. The provision may not merely serve as a threat to secure performance or as a means to punish non-performance. It seems to me that factually what we have here is this amount of money, whether you call it liquidated damages or whether you call it a penalty, is something that was used to punish non-performance in the form of a several month delay. What's your response to that? Your Honor, what happened here and I think what the trial judge found is that if you look at the Jamison test, it's when the parties entered into the agreement, what did they anticipate as possible damages by negotiation? And I would submit that what they anticipated as possible damages for the failure to meet that deadline are two things. One, possible loss of rent for at least three months on the Hy-Vee lease and then on two other tenants that would have moved into the Hy-Vee premises. And more importantly in this How much money is that? I don't know. It's not 4.3. It ain't much. But I can tell you that we're talking here about a $38.5 million purchase of a mall. If during that time of delay, the 90 days, other tenants started to get together and had not signed yet and did not receive the premises, they could have fled. And then we're talking Did that happen? No, but you don't So why is it bad to call it hypothetical? Well Because it didn't in fact happen. Your Honor, when you look at the cases, Carini and Bethlehem Steel, both were cases where there was a delay and there were no actual damages. And the court said they upheld the liquidated damages there because you don't look at what actually happened later. You look at what the parties were negotiating when they were anticipating damages. And in fact in the Carini case decided by this first district, in that case the buyer was unable to get financing to purchase the unit. They forfeited an earnest money, which is about 10% of the total cost. And then they were able to sell the unit for more money. So not only was there no actual damages, there was actually a profit to be made. And yet the court said you look back when you're anticipating damages. And I would submit that that 4.5 was a reasonable number to anticipate not only what they would have lost had there been a total failure, but the possible consequences if they didn't get that thing signed on time. So the specific amount is 4.3, you said 4.5, whatever. 4. What's the specific breach then to satisfy the language of Jameson on this particular problem? The failure to turn the premises over to Hy-Vee in a condition that they could then at that point start getting settled and charged rent eventually because they did not have their permits. But it was not their, it's Hy-Vee to get the permits. So what I'm saying is when I said earlier, whoever drafted this contract at the beginning blew it twice. Once they should have had five more words in the initial contract saying something that for lesser breaches X will occur. And then the alternative permits are Hy-Vee's problem and ABC. Well, Your Honor, first of all, let's look at what the trial judge found as a matter of fact. Because then we're dealing with a manifest weight. She found that all the parties believed, the buyer and seller, in December of 2004 that they were going to be able to meet those deadlines and that Hy-Vee would have it honored before October 31st. She also found as a finding that in July of 2005 that there still was time to complete the deadline by October 31st. That was a finding. Now that lease, she also found, was negotiated largely by the seller, not by us, and that we couldn't object to the terms of the lease even though we thought it was not commercially reasonable, so we had to sign it. And we had no input with respect to those deadlines. So as of July 15th, there is a finding, which I contend is not against the manifest weight of evidence, that those deadlines could have been met. And that's what the seller negotiated. If there was a failure by Hy-Vee, the seller should have been aware of that when he was negotiating with Hy-Vee for that. So the contemplation was those deadlines would be met. But what the seller did agree to, which was a very important provision for us, is that that deadline would be met. And, Your Honor, if you look at this third amendment, I mentioned 1K, which is the hold back on the 4.3. Look at 1L, which is the next provision. In 1L, it deals with three other tenants. It deals with Starbucks. It deals with Cold Stone Creamery and, I think, Pancetto's. In that provision, there was a hold back of, I think, $1.4 million. And as each of those leases were signed, monies were released to the seller. That is not what was negotiated in Number K. In L, there were no deadlines. In K, there was a deadline. Why? Because it was an anchor tenant that was extremely important to the success of that mall. They didn't care about Starbucks meeting a certain deadline. They'll get their money if Starbucks signs. They didn't care about Pancero's. They didn't care about Cold Stone Creamery. They cared about Hy-Vee. And that's why they put that deadline in there, because of the concern that if that deadline is not met, there could be problems with other tenants not signing on. So I submit that what we're talking about here is more than just an incremental value of the lease with Hy-Vee. What we're talking about here are anticipated damages in December of 2004 looking forward that could have happened. Is there anything in the record to indicate that there was some discussion of what the buyer's damages would be if the provisions were satisfied on November 30th as opposed to October 31st? And are they going to withdraw and suffer a $4 million damage because it was 30 days late? Is there anything in the record to indicate there was any kind of discussion or calculation of what loss they would suffer? No, there is not. This was a negotiated amount. And, Your Honor, we each discussed a number of cases. And, in fact, there was one I believe that was cited by the appellants. And it was a Seventh Circuit case. And it was Checkers v. Hawkins. And in that case there had been a breach of an installment payment that was missed by one day. And then there was another breach of another installment payment that was missed by eight days. And the court said, we're not going to impose this $150,000 penalty if you failed to make those payments. But if you also look at another Seventh Circuit case, which was decided later, Exco International v. Pacific Scientific, they talk about where you have, like, Your Honor, similar to your question, if you have a one-month delay, what does that mean? They say it's not to invalidate the liquidated damages clause. It's perhaps reform the contract to make it reasonable so under those circumstances it would not be too punitive. I mean, that's what the discussion was there if you have the situation. And we would have an entirely different argument if we're talking about one day or seven days. We're talking about 91 days past a deadline that was important enough to put in an agreement based upon the possibility that other tenants may not sign up. And we lose the value of a $38.5 million deal. And, Your Honor, as we said, we're talking about either 3 percent of the total deal, which was $117 million, or we're talking about 10 percent of the value of them all, which isn't much in terms of liquidated damages. Because if we don't get those other tenants to sign in a timely fashion, we could lose the value of the entire deal. That's why this had a deadline in 1K in this Third Amendment and why there was no deadline in 1L. So we believe the trial court found correctly. And I'm not here to denigrate the trial judge's opinion. I think she did a fine job. She, in fact, most of the findings of fact have been stipulated by the parties. And where she did have findings of fact, it dealt with the party's intent and what actually could happen, such as what they believed could be done in terms of the deadlines, when they thought it could be done. And those findings of facts have not been really contested. What conclusion she drew from that is there's more here than just Hy-Vee not signing because, again, if you look at 1L, the parties knew how to address a total failure to execute a lease. They knew how to do that. They did that in 1L. In 1K, they negotiated a deadline that was obviously important to my client because of potential exposure. And the $4.3 million is a very low number if Hy-Vee had not signed at all. And in my opinion, is a reasonable number based upon the second. If they had not signed at all, you might have a different, you know, record underneath as well. But the fact that they did sign, and you're talking a 91-day delay, does call into question the concepts of reasonableness and proportionality. It does if you base it upon what actually happened, which is what the courts have not done. If you base it upon what the parties reasonably anticipated could happen during a delay of 90 days, and that is, Your Honor, the other tenants leaving the property, you're looking at far more than a $4.3 million loss. And so you can't look at it after it happened to see whether or not other tenants had left during that 90 days. You have to look at it at the time the parties were trying to anticipate damages. And it's anticipated or actual. And again, the two cases that we cited in our brief, and there were others, the Karimi case and the Bethlehem Steel cases, were both cases where there were no actual damages. And counsel was arguing, well, look at how we benefited by this. Well, one, we took a great risk to go forward with this with Hy-Vee up in the air, and we thought we had negotiated a resolution to that. Number two, in terms of what we actually were able to get, like in both of those cases that I cited, the City of Chicago was paid liquidated damages for no damages to them at all for the delay. And in the other case, the Karimi, the seller actually made money. And this court and the Supreme Court held that's not relevant. But in Bethlehem, they had calculated a reasonable amount for each separate breach, where in this case we got the whole whammy for relatively insignificant types of breaches. But two things where I disagree is, one, when you say the whole whammy, because the 4.3 is not what the total damages would have been had Hy-Vee failed to sign. By the way, that was a negotiated term. They keep saying it was just us that proposed that figure. It was a negotiated term. That would have been the loss of the incremental value. That would not have taken into account, as the trial judge said, what the effect would have been on other tenants. So that was probably just a minor number had there been a total failure. Secondly, with respect to just a insignificant delay, we're talking about 90 days during a period where, as the trial judge found in her conclusions, that that could have had an impact on other tenants. And again, you have to look at the time they had reached that agreement. If Hy-Vee was not going to be in that space, it would have had a domino effect. And there's no question in my mind that had Hy-Vee not signed at all, and we wanted the 4.3, the other side was, and we said our damages were greater than 4.3, they'd say, yep, that's what you negotiated. That's a cap. In this case, it worked in our favor. But at the time we negotiated, there was a great amount of risk that that number would have been really low. I want to bring up one thing that your colleague brought up in the reply brief, and that is that the third Jameson factor requires you to, the court to evaluate whether actual damages would be uncertain in amount and difficult to prove, and then he ties that statement to the facts of this case by saying that you'd have to establish that the buyer would receive $4.3 million if Hy-Vee was 91 days late in getting the building permits. Do you think those two naturally flow together? Do you think that's a reasonable leap in logic? Well, Your Honor, first of all, I agree with counsel that when you look at Jameson in points two and three, it does seem on its face somewhat contradictory, although they're simply adopting the restatement cycle of contracts, which has had much more case law on it. But essentially there's two things that you're doing. You're trying to come up with a number that might reasonably approximate damages, which in this case, they were looking at the incremental value, although that was just one component of it. And then third, you're looking at an unknown, and the unknown was the effect on other tenants. And so both of those factors were here, and I think that's what Judge Quinn found. The unknown part was what's going to happen to this mall? The $38 million investment that we made for a rental street? We don't know. The second problem, we tried to guess what it would be as to Hy-Vee only, but it's the third we don't know, and therefore I think we've met those three. I don't know if I answered your question exactly, but I was dealing with those two. It's responsive. This Court has addressed this issue a number of times, and in fact, I think the Seventh Circuit is right in the Exco case that the trend now has been more towards enforcing liquidated damage clauses than not, as opposed to what counsel has said in their brief. And we did cite to that observation by the Seventh Circuit by citing a number of Illinois courts where they've upheld liquidated damages. And the other cases that they had cited in their cases all were somewhat unique, where there were different ways to determine liquidated damages or where there was a total failure proof. And by the way, I just want to mention one more thing, and then I'll be happy to answer any other questions before I conclude. As to whether it's a penalty, the Illinois Supreme Court has said in the cases since then that the burden is on the party who is trying to avoid the imposition of liquidated damages. The burden is on that party to show that this can only be construed as a total failure. And I would submit that they did not meet that burden because, as the trial court correctly found, there were other circumstances here that would justify that number beyond just the incremental value of what Hy-Vee would have paid had there been a total failure. She was talking about two situations, either a total failure or a failure for date. They didn't. And that's what the parties negotiated. There's no deadline for Starbucks. There is a deadline for Hy-Vee. So we respectfully ask this court to affirm her ruling. I'll stand on the briefs on the issue of our cross appeal, which is whether or not we're entitled to post-judgment interest because I think it's fairly straightforward and both sides have addressed it. So I will not be addressing that. Thank you very much. Mr. Maynard. Very briefly, we agree this is a delay case. This is a delay case because there was no failure of consideration here. And we're schooled by the case law in Illinois that delay cases, when we have valid and enforceable liquidated damage provisions in a delay case, such as there are a function, a linear function which vary as a function of time. In Bethlehem, it was 1,000 or whatever it was a day, each for each day of delay. Here, we don't have. We have the whole whammy, as Justice House said. We've got the whole whammy coming down at the stroke of midnight on October 31, 2005. And it's justified, again, by pointing to something, to a risk, a contingency, which buyer owned. They owned the risk. They bought this property knowing full well that the Wal-Mart space that we're talking about had been vacated by Wal-Mart in March of 2004 and was empty during the time they were examining the property, doing their due diligence, issuing their letter of intent, entering into a contract to purchase, entering into the deposit money escrow agreement, the Third Amendment. It was empty that whole time. And so we're asked to believe here that at the stroke of midnight on October 31, 2005, there was going to be some kind of tenant revolt. All the tenants were suddenly going to say, we're tired of waiting for this space to be occupied. And there's something magical about October 31. Wasn't there some concern, though, on the part of the people that you represent here as proven by the fact that they started communicating a couple days later about let's extend this deadline that had already passed? Wasn't there something in the record about that? Absolutely. And, in fact, the trial judge, when she spent most of her opinion trying to decide what the parties intended by this date and finding that it was a drop-dead deadline, said, you know, that this was like an admission, that they expressed concern. She used the term fret. They fretted about it. And they're really smart people, and they fretted about it, and they reached out and said, let's remove this issue because obviously we didn't intend. I'm guessing you don't agree with her on that. I don't agree that reasonable business people trying to resolve what may be construed as a contingency where they're being set up, if you will. Right. Right. I would submit to you that smart people can say, we don't agree with this position, but it certainly is valuable to reach out and resolve it. And the response they got, which is very interesting here, they did reach out. And in November of 2005, they got a response from the buyer. And what did they say? Oh, no. After October 31st, all the tenants are going to leave, whether they're under lease or not. And all these unnamed hordes of people who would have come in and rented space, they're all gone, too. Now, mind you, there isn't anything in this record to support any of that. And if you look at the judge's opinion, she doesn't cite any record evidence, and counsel hasn't done it here either. So you're asked to speculate and join in this fantasy about the terrible effect that would occur at the stroke of midnight on October 31st of 2005, notwithstanding the fact that there's absolutely nothing in the record to support that other than rank speculation. Nothing. Counsel talks about the Exco case. The Exco case says, and I quote, the element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach. So we're a day late. And by the way, whose breach is this? Hy-Vee. We have no control over Hy-Vee. What was this? It was a wager. It was an illegal wager on the conduct of a third party that wasn't in our control. And by the way, Hy-Vee wouldn't be able to go and get building plan approvals without first getting approval from the landlord. And if you look at the history here, it looks like the landlord wasn't really in too big a hurry to make sure that the original deadlines were met. It's a delay case. But there is a red flag here. The courts of Illinois have said liquidated damages, and I quote, they must place the non-breaching party in a position that he or she would have been in had the contract been performed not provide the non-breaching party with a windfall recovery. That's Jones v. Hearn. It's a decision of the first district in 2002. So what we have here is the day they contracted for this, what they claim is a liquidated damage, it would have been the buyer's fondest hope that not the building permits by October 31st because it would be better off if the contract were not observed. And that's what's happened. Seller did everything they were supposed to do. They delivered an asset that the buyer valued at $4.3 million. Buyer doesn't want to pay for it. It's that simple. And for those reasons, Your Honors, we would submit that this case should be reversed, that the decision of the trial court that this was a valid award of liquidated damages should be reversed. This was a penalty. And there should perhaps be further proceedings with respect to some issues related to the parking lot that's mentioned in the pleadings. $500,000 for the parking lot, right. Which our position is that that's excessive. We would have to litigate that because the court didn't reach it because of the finding that they gave him the whole whammy, as Justice House said. Thank you. This matter will be taken under advisement. A decision will be entered in due course. The case was well-argued and well-briefed. I think we all enjoyed it. Thank you very much. Yeah, both sides were very enjoyable.